Colin Hunter, OSB No. 131161
chunter@bradleybernstein.com
BRADLEY BERNSTEIN SANDS LLP
1425 SW 20th Ave., Suite 201
Portland, Oregon 97201
Telephone: 503.734.2480

Christopher Heywood, OSB No. 163984
chris@jhoffman.com
JANET HOFFMAN & ASSOCIATES LLC
1000 S.W. Broadway, Suite 1500
Portland, Oregon 97205
Telephone: 503.222.1125

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

SEAN LUNDRY, an individual.

Plaintiff,

v.

CITY OF SANDY, a municipal corporation; STAN PULLIAM, an individual, in his personal capacity; TYLER DEEMS, an individual, in his personal capacity; and JEFF APRATI, an individual, in his personal capacity,

Defendants.

CASE NO.

**COMPLAINT FOR UNLAWFUL RETALIATION, WRONGFUL DISCHARGE, AND CIVIL RIGHTS VIOLATIONS**

DEMAND FOR JURY TRIAL

## INTRODUCTION

1.

Plaintiff Sean Lundry brings this action to remedy a pattern of unlawful and unconstitutional conduct that resulted in a baseless criminal investigation and, ultimately, his wrongful termination from the City of Sandy. In service of their own narrow personal and political agendas, the Defendants baselessly investigated, disciplined, retaliated against, and ultimately terminated Lundry's employment.

2.

The Defendants' politically and personally motivated misconduct resulted directly from Lundry's challenges to City leadership, including protected First Amendment speech highlighting the Defendants' hypocrisy and gross mismanagement of the City's process for hiring a new police chief.

3.

The Defendants' unlawful, unconstitutional conduct not only deprived Lundry of his longtime employment with the City of Sandy, but also permanently tarnished his reputation and continues to cause him to suffer damages to this day. Lundry is entitled to a remedy for the Defendants' pattern of unlawful conduct, and he brings this action for that purpose.

## THE PARTIES

4.

Plaintiff Sean Lundry is a dedicated public servant and—until the Defendants' unlawful conduct—served as a longtime law enforcement officer with the Sandy Police Department ("SPD"). Most recently, Lundry held the position of Acting Chief of SPD. He resides in Clackamas County, Oregon.

5.

Defendant City of Sandy ("Sandy" or the "City") is a municipality located in

Clackamas County. The SPD is an agency of Sandy and operated as such at all relevant times.

6.

Defendant Stan Pulliam has served as the mayor of Sandy since 2019. He resides in Clackamas County, Oregon.

7.

Defendant Tyler Deems worked as the City Manager of Sandy at all relevant times. On information and belief, he resides in Multnomah County, Oregon.

8.

Defendant Jeff Aprati worked as the Deputy City Manager of Sandy at all relevant times. On information and belief, he resides in Washington County, Oregon.

**JURISDICTION AND VENUE**

9.

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.

10.

The Court has personal jurisdiction over each of the Defendants because they reside in Oregon.

11.

Venue is proper in this district and division because Lundry's causes of action arose in Clackamas County.

12.

On July 16, 2024, Lundry timely served a Tort Claim Notice on the Defendants pursuant to ORS 30.275.

//


BRADLEY BERNSTEIN SANDS LLP
1425 SW 20th Ave., Suite 201
Portland, OR 97201

## FACTUAL ALLEGATIONS

### A. Mr. Lundry's Long Record of Public Service and Promotion to Interim Chief of Police.

13.

Mr. Lundry is an experienced law enforcement officer who has dedicated more than two decades of his life to public service. After 13 years with the Dalles Police Department, Lundry joined SPD in 2015, where he went on to serve with distinction, receiving positive annual evaluations every year.

14.

Lundry he was quickly promoted to Sergeant in 2017. Just two years after that, he was promoted again to Lieutenant in 2019.

15.

Based on his 20-year record of exceptional service, in September 2023, Lundry was deservedly promoted once again – this time to the role of Interim Chief of SPD.

### B. The City Begins its Search for a Permanent Chief of Police and Lundry Questions the Defendants' Use of Police Department Funds.

16.

While Lundry served as Interim Chief, the City initiated a recruitment process for the permanent role of Chief. In or around August 2023, the City entered into a contract with GMP Consultants to conduct that recruitment process.

17.

While serving as Interim Chief, Lundry discovered that Deems and the City had used approximately $30,000 from SPD's general budget to pay for GMP Consultants' work.

18.

Lundry believed the use of SPD's limited general funds for this purpose constituted mismanagement of City funds and that it was inconsistent with how


BRADLEY BERNSTEIN SANDS LLP
1425 SW 20th Ave., Suite 201
Portland, OR 97201

City leadership had represented that the search would be paid for. Accordingly, he raised the issue with the City's accounting staff, asking that they reverse the transaction, instead use the City funding that had been allocated for the police chief search process, and return the $30,000 in funds to SPD.

19.

Following Lundry's disclosures of this mismanagement of City funds, the City's accounting staff informed him that he needed to raise any such complaints with Deems. When Lundry informed Deems he believed the use of SPD funds was improper, Deems declined to return the funds to SPD.

20.

Lundry then raised the issue of Deems' apparent misuse of SPD funds with City Council President Laurie Smallwood.

21.

Despite his concerns over Deems' misuse of SPD funds, Lundry participated in the recruitment process, applying for the permanent position of police chief. By early 2024, he had rightly earned his place as one of three finalists for the position.

22.

On January 3, 2024, the City held two short "meet and greet" receptions at which members of the community and SPD employees could meet and provide feedback to Lundry and the other two finalists. During the receptions, the City provided comment card forms to attendees that could be used to ask questions or provide feedback to the finalists at the reception or at a later time.

23.

The City received comments from approximately 30 people—some handwritten forms submitted at the reception, some typed forms submitted later,

and some comments provided informally by email. Commenters were not required to provide their names on the cards; most chose to remain anonymous.

24.

The vast majority of the approximately 30 commenters strongly supported Lundry for the role of Chief, remarking time and again on his knowledge of Sandy, his commitment to the community, his relationships within SPD and with other law enforcement agencies, his positive leadership qualities, and his preparedness for the role of Chief.

25.

For example, Commenters noted that they were "proud to have [Lundry] as our interim chief," called him a "positive influence and positive liaison between the community  and the police department," said he "has a known track record of leadership in the community," noted that he was "respected by his officers [and] leaders in the community [and] the community in general," and said he "was a great leader [who] cares strongly for Sandy."

26.

Against that backdrop of overwhelming support for Lundry, a single anonymous commenter criticized Lundry extensively for things the commenter alleged Lundry had said and done while serving as Interim Chief. According to the anonymous commenter, Lundry in one instance shredded documents from the former Chief's office and stated "If we don't have it, we don't have to produce it." Although the commenter chose to remain anonymous, on information and belief, it was an SPD employee with a personal agenda against Lundry.

//

//


**BRADLEY BERNSTEIN SANDS LLP**
1425 SW 20th Ave., Suite 201
Portland, OR 97201

## C. The City Passes Over Mr. Lundry for Chief and Faces Backlash from the Community.

27.

On January 16, 2024, Defendants Deems and Aprati informed Lundry that he had not been selected as Chief, purportedly based on the level of experience offered by one of the other finalists. The City announced its selection of another candidate—Gary Jensen—the following day. Neither Deems nor Aprati mentioned the comment or made any suggestion that Lundry was being denied the role based on any allegation of misconduct.

28.

To the contrary, in an announcement to City staff, Deems wrote that he wanted to "extend a huge 'thank you!' to Interim Chief Lundry for ensuring our police department ran smoothly during this transition." In a corresponding public press release, Deems similarly expressed thanks to "Interim Chief Sean Lundry for his service to the community, especially during this transition period."

29.

The City immediately received both internal and community backlash to its decision to hire Jensen and pass over Lundry, including from senior City staff and even from the City Council President, who publicly stated that the City had made the wrong decision in opting against selecting Lundry as Chief.

30.

Following the City's announcement that it had chosen Jensen over Lundry, community members quickly developed concerns about Jensen's suitability for the position based not only on his lack of any evident interest in Sandy, but also based on incidents that occurred during his leadership of the police department in Logan, Utah, from which he had retired less than a year prior.


**BRADLEY BERNSTEIN SANDS LLP**
1425 SW 20th Ave., Suite 201
Portland, OR 97201

31.

This included concerns that Jensen was sexist and could be expected to discriminate against women at SPD, as well as information that Jensen had hired an officer who, in a prior law enforcement role, had shared inappropriate photos of a murder victim in a case that resulted in an eight-figure settlement with the victim's family.

32.

Jensen had also made the news for other incidents that were readily searchable on the internet. In 2007, his selection for the role of police chief in Logan, Utah, was derailed after a video was released showing Jensen allowing a member of the public to use his nunchucks on another person at a rock concert.

33.

In 2021, while serving as police chief in Logan, Jensen and his deputy chief were secretly recorded advising Utah State University football players to call or text the Logan Police Department in order to avoid potential legal trouble, with Jensen telling the players that "We want you guys to play ball….And we will work with you to the best of our ability."

34.

In addition, Jensen had made racist and sexist comments during the January 2024 receptions with the finalists for the position of chief. Despite requests to do so, the City never investigated Jensen for these comments.[1]

35.

To determine whether and how the City had considered these issues during the selection process, Lundry urged community members—including his wife—to

---

[1] —The City's lack of interest in investigating Jensen's comments—totally contrary to its willingness to aggressively pursue baseless allegations against Lundry—is further evidence of the pretextual nature of its "investigations" into Lundry.

serve public records requests seeking all records relating to the selection process.

36.

With Lundry's urging, three community members submitted public records requests in January 2024 that sought copies of the comment cards from the January 2024 police chief candidate receptions, any background investigation information regarding Jensen, and interview questions and application scoring information relating to Jensen.

37.

In addition, with Lundry's urging, his wife Shawna Lundry served a broader records request seeking all records relating to the recruitment process.

38.

In response to those requests, the City released a limited set of records to the requestors. (The City released the records only to the requestors themselves; it did not post them publicly.) However, the City refused to release the comment cards—which were overwhelmingly supportive of Lundry—from either of the January 2024 police chief candidate receptions.

39.

Lundry worked with the records requestors to appeal the City's refusal to release the comment cards and, in parallel, urged community members to attend a February 5 meeting of the City Council—the first such meeting since the City had announced its selection of Jensen for the role of police chief.

### D. The City Scrambles to Find a Reason for Passing Over Lundry and Keep the Comment Cards from Public Disclosure.

40.

As this community backlash grew, City leaders began scrambling to find some way to discredit Lundry—the superior candidate for the position of Chief, and the one who had garnered the most public support—and to justify their decision to


BRADLEY BERNSTEIN SANDS LLP
1425 SW 20th Ave., Suite 201
Portland, OR 97201

instead hire an out-of-state candidate with a dubious background and no knowledge of the Sandy community.

41.

On February 1, 2024, Deems called Lundry to a meeting to ask why Lundry had changed the signature line on his email from “Interim Chief” back to “Lieutenant,” and to make sure that Lundry was still willing to continue serving as Interim Chief. Lundry made clear that he would continue serving as Interim Chief and clarified that he had changed his signature line only in recognition of the fact that the City had identified someone else as its next Chief of Police.

42.

During that February 1 meeting, Deems also asked Lundry about a rumor that Lundry had said that he would fly to Utah to punch Jensen. Deems admitted he knew there was no truth to the rumor, which was absurd on its face.

43.

Deems made no mention of any concerns about Lundry during this meeting, much less of any investigation into him. To the contrary, Deems told Lundry that he appreciated him and was happy that he was in Sandy.

44.

Public displeasure with the City’s conduct boiled over during the February 5 City Council meeting, at which the community members Lundry had urged on appeared, detailed the concerning information they had learned or observed about Jensen, objected to the City’s refusal to release the comment cards, and generally questioned the City’s decisionmaking process. During that meeting, two City Councilors who had participated in the January leadership panels (Don Hokanson and Chris Mayton) expressed praise for Lundry’s performance in the process, and Mayton said he knew the job was between Jensen and Lundry.


**BRADLEY BERNSTEIN SANDS LLP**
1425 SW 20th Ave., Suite 201
Portland, OR 97201

45.

While Pulliam and other councilmembers defended the decision to hire Jensen, at the conclusion of the February 5 meeting, the Council president (Laurie Smallwood) publicly stated that the City had made the wrong decision in hiring Jensen.

46.

The City was also forced to defend its attempt to withhold the comment cards from public disclosure. On February 14, 2024, the Clackamas County District Attorney's Office rejected the City's attempt to withhold the comment cards, forcing the City to reveal to the community that the vast majority of comment cards were strongly supportive of Lundry and that many of the comment cards were critical of Jensen, the City's chosen candidate.

47.

On February 17, having been ordered to release the comment cards, the City released a redacted version of them. In doing so, however, the City chose to depart from its ordinary public records practice in an effort to blunt the public criticism it was facing. Rather than simply release the comment cards to the requestors in accordance with normal practice, the City instead chose to post them publicly on the City website with a cover letter that attempted to paint its attempt to conceal them in a favorable light.

48.

Notably, the City posted only the comment cards, and not the other public records relating to the selection process—including numerous letters of recommendation for Lundry—that would have further highlighted its flawed decision.

49.

On the evening of February 20, the City Council held an executive session prior to its scheduled public meeting. The executive session ran long, and even from the lobby, Lundry—who was waiting to attend the public meeting in his role as Interim Chief—could hear raised voices coming from Council chambers.

50.

Beginning in late February, with the City's false narrative surrounding the hiring process having been exposed by community members who supported Lundry, the Defendants' approach to Lundry changed rapidly and dramatically.

## E. The City Pursues a Baseless Investigation and Places Lundry on Administrative Leave in an Effort to Discredit Him.

51.

On February 23, 2024, Deems called Lundry into another meeting. During the February 23 meeting, Deems announced that Lundry was immediately being placed on administrative leave and being referred for criminal investigation.

52.

According to Deems, the purported basis for this abrupt decision was the anonymous comment card, which the City had received more than a month and a half earlier during the January 3 meet-and-greet reception, that falsely alleged that Lundry had improperly shredded unspecified public records.

53.

On the basis of a single, stale comment – that was clearly biased and comprised 25 anonymously written words—the defendants chose to initiate a baseless criminal investigation of Lundry, referring him to the Oregon State Police to be investigated for destruction of public records and official misconduct. The defendants did so despite the fact that the Clackamas County District Attorney's

Office, in reviewing the comment cards to determine whether they were releasable public records, had seen no basis for investigating Lundry.

54.

At the same February 23 meeting, the City provided Lundry with a "Notification of Administrative Investigation and Paid Administrative Leave." In addition to announcing the criminal investigation, the notice referred to unspecified other allegations as to which the City had "not yet decided whether to open an internal, administrative investigation." The notice claimed that Lundry would receive an "updated notice that includes a description of [those] allegations."

55.

The notice required Lundry to turn in his "duty weapons, department and vehicles keys, department vehicle, and badge/ID card." It did not require Lundry to return any other City property or to refrain from accessing or using City-issued computer or devices.

### F. The City Publicly Announces Lundry's Administrative Leave and Posts the Comment Cards Online.

56.

That same day, on February 23, 2024, the City publicly announced that it was removing Lundry from the role of Interim Chief, purportedly "[a]s a result of information that has been brought to the City's attention during the Police Chief recruitment process." The City's public news website then linked to another website—both of which remain online today—on which the City posted the redacted set of the comment cards submitted during and after the January "meet and greet" reception.

57.

In his role as city recorder, Aprati is responsible for all official


BRADLEY BERNSTEIN SANDS LLP
1425 SW 20th Ave., Suite 201
Portland, OR 97201

communications on the City's website and social media accounts. On information and belief, Aprati drafted and posted the City's website updates and social media posts disparaging Lundry, and Deems approved and/or ratified those communications.

58.

In parallel, Pulliam began pressuring other City officials to abandon their support for Lundry based on the supposedly "new information" that Defendants claimed to have discovered regarding Lundry, telling them to "get right"—meaning to get on board with the City's flawed decision to hire Jensen.

59.

Pulliam had a preexisting bias against Lundry, who he believed did not support his vision for the City of Sandy; for example, Pulliam was upset that Lundry did not support "branding" SPD vehicles with the City's logo, and he was upset that Lundry disagreed with his (Pulliam's) desire to aggressively police and arrest unhoused people who had committed no crimes.

60.

Pulliam had, throughout the police chief recruitment process, been telling others that he was determined to prevent Lundry from becoming police chief as long as he was mayor—even though, on paper, the ultimate hiring decision fell to Deems as City Manager.

61.

In fact, no "new information" justifying the City's drastic about-face had "emerged." The City's newly conceived allegation of the destruction of public records was baseless and purely pretextual—nothing more than a belated attempt to justify its ill-founded decision to pass over Lundry in favor of an out-of-state candidate with a checkered background. Indeed, even the baseless, anonymous


BRADLEY BERNSTEIN SANDS LLP
1425 SW 20th Ave., Suite 201
Portland, OR 97201

accusation that Lundry had destroyed public records was a month and a half old at the point of the City's announcement.

62.

While the Defendants had never suggested that the comment cards warranted any action whatsoever, on that day, they suddenly changed course, attempting to argue that the single anonymous comment relating to Lundry's shredding of documents now warranted his immediate discipline—and, not only that, his immediate referral for criminal investigation.

63.

In fact, the Defendants' initiation of disciplinary and criminal investigations against Lundry was motivated not by any legitimate belief in the violation of law or policy, but rather by their intention to retaliate against him for questioning their leadership and bringing their mismanagement to light.

G. **The Defendants' Baseless Criminal Investigation Falls Apart**

64.

When OSP forwarded its investigation to the Clackamas County District Attorney's Office, the District Attorney's office quickly and correctly determined that there was no basis for prosecuting Lundry for any crime.

65.

In fact, as the District Attorney's office noted, there had been no basis for the investigation to begin with. In the words of the Chief Deputy District Attorney, "At the conclusion of the investigation, no one could point to any documents that had been disposed of by Lt. Lundry that needed to be retained by law….The investigation uncovered no evidence that Lt. Lundry unlawfully and knowingly destroyed or tampered with public records, or did so for the purpose of obtaining a benefit or harming another."

66.

In addition to lacking any evidence whatsoever, the Defendants knew their baseless attempt to have Lundry prosecuted was fatally flawed for another reason.

67.

Specifically, the Defendants knew that the anonymous comment falsely accusing Lundry of destroying public records came from Records Specialist Tessa Freeman, who had a known personal bias against Lundry arising out of Lundry's response to Freeman and her supervisor's workplace misconduct.

68.

In March 2023, SPD purchased new office chairs to be used in the report writing room (the room used by patrol officers to write reports). The officers unpacked the new chairs and discarded the boxes.

69.

Later that month, upon arriving at SPD's offices for an overtime shift, an SPD officer discovered that someone had removed the new chairs and had locked them in the secure evidence room. In addition, someone had piled all the discarded cardboard boxes in front of the report writing room and had left a note stating that officers needed to properly dispose of all the packaging material.

70.

Lundry learned that it was Freeman and her supervisor, Juli Smith, who had locked away the patrol officers' new chairs and piled refuse in front of the report writing room in an effort to "teach them a lesson"—the lesson apparently being that they needed to better dispose of trash. Lundry subsequently admonished Smith and Freeman for their petty conduct during a meeting of SPD's administrative team, leading Smith and Freeman to hold grudges against Lundry from that point forward.

71.

Smith and Freeman's bias against Lundry deepened later in 2023 when Lundry filed a formal complaint against Smith after discovering—in the course of requesting proof of crime reporting from the records department as part of a reaccreditation process—that the records department had incorrectly been treating Oregon's mandatory crime-reporting obligations as voluntary.

72.

As a result of Lundry's efforts to address their workplace misconduct, Smith and Freeman were staunchly opposed to Lundry becoming Police Chief, and the City relied on Freeman's baseless complaint against Lundry despite knowing that she held a specific bias against him.

## H. Sandy Publicly Campaigns Against Lundry With False Accusations.

73.

Not satisfied with having forced Lundry out of the role of Interim Chief, the City—continuing to face public criticism for its decision to pass over Lundry—proceeded to engage in a public campaign to malign and defame a longtime public servant in a misguided attempt to protect City leaders from suffering blowback for their unlawful conduct. As part of this campaign, the City gratuitously sought out opportunities to air false accusations of criminal and other misconduct against Lundry.

74.

For example, using his official title and email address, Sandy City Councilor Carl Exner submitted a letter to the editor in the March 1 edition of *Hoodview News* describing Lundry as "the interim chief that has made it difficult to support him" and asserting that "accusations" against Lundry "have to be looked into."


**BRADLEY BERNSTEIN SANDS LLP**
1425 SW 20th Ave., Suite 201
Portland, OR 97201

(Ironically, that same edition of *Hoodview News* included an editorial lambasting the City for its "dubious" decision to pass over Lundry.)

75.

In another incident, in response to the news that Lundry had been cleared of criminal charges, the City inserted itself in a Facebook discussion to attempt to rebut a Sandy community member's accusation that City leadership was acting in a "self serving" manner and "[w]ith little to no transparency."

76.

The City responded by specifically alleging that Lundry was being investigated in "two separate investigations" regarding "serious accusations"—one criminal investigation and a second investigation, "broader in scope," related to unspecified accusations of "workplace misconduct." When challenged by other Facebook users supportive of Lundry, the City employee who had posted this information refused to provide their name.

## I. The City Escalates Its Campaign to Force Lundry Out.

77.

Having decided to find a way to force Lundry out of SPD, the City doubled down even while OSP's investigation was pending.

78.

On March 6, 2024, the City—finally acknowledging the issues that Lundry and other community members had been raising for two months—announced that, based on the results of a background check, "Gary Jensen is no longer under consideration for the Sandy Police Chief position." Rather than offer the position to Lundry, however, the City announced that it was "launch[ing] a new recruitment process for the Police Chief position" that "will involve more extensive review of candidates before they reach the finalist stage"—another public rebuke of Lundry.

79.

Notably, despite two City Councilors having previously described Lundry as the candidate next in line for the position of chief, the City summarily rejected Lundry's candidacy at this point even though no one had completed any investigation, much less concluded he had done anything wrong.

80.

On March 7, the City sent Lundry an additional notice announcing that it would be conducting an internal investigation into three allegations: (1) alleged destruction of public records—the same false allegation that the City had already referred to OSP; (2) alleged "[h]arassing and/or bullying behavior with subordinate employees"; and (3) alleged "[t]hreats of violence in the workplace." As with the allegation regarding public records, each of the additional allegations was false, baseless and pretextual.

81.

On May 22, 2024, the City sent Lundry a 7-page letter (the "May 22 letter") entitled "Investigation Findings and Notice of Pre-Disciplinary Meeting" in which Deems announced his intention to terminate Lundry's employment with the City. That letter was nothing more than a blatant attempt by the City to cover its tracks—a transparent effort to paper Lundry's file with a litany of false, vague, and immaterial allegations as to which the City had never provided Lundry any notice, much less any opportunity to be heard.

82.

In its May 22 letter, the City largely ignored the alleged policy violations for which it had supposedly been investigating Lundry. Instead, Deems raised a bevy of new allegations as to which he had supposedly developed "concerns" and then—rather than conduct an investigation, provide Lundry notice, or allow him to be


BRADLEY BERNSTEIN SANDS LLP
1425 SW 20th Ave., Suite 201
Portland, OR 97201

heard—simply concluded that Lundry's "overall conduct" warranted his termination.[2]

83.

Far from substantiating any specific, objective allegation that would warrant any discipline—much less termination—Deems' letter was rife with vague, subjective allegations and conclusions, including Deems' accusation that he had developed concerns about Lundry's "leadership and management style" and that he believed Lundry lacked "emotional intelligence."

84.

In addition to ignoring the noticed policy violations, the City's May 22 letter also recklessly and falsely accused Lundry of dishonesty. Deems claimed that Lundry's initial denial of making a comment relating to punching Gary Jensen shifted over time, specifically asserting that Lundry later responded to that same question by saying "not to my knowledge."

85.

In reality, the second statement was responsive to a different question—one asking Lundry if he had said anything *like* that. Furthermore, Deems intentionally cherry-picked the "not to my knowledge" quote from a larger statement in which Lundry asked for further clarification that was never provided. Deems included this misleading, misquoted allegation of dishonesty while disregarding the actual evidence

[2] In addition, Deems claimed that "it was discovered during the investigation that you retained certain City property while you were on administrative leave and under investigation that causes me great concern." In fact, Lundry had no obligation to return any City property other than the property identified in the notice of administrative leave the City had provided—and the City had no basis to discipline Lundry for keeping property the City had not asked him to return or to refrain from using. As a matter of fact, however, Lundry had voluntarily returned his City-issued laptop and cell phone after being placed on administrative leave in February 2024, even though he was under no obligation to do so.

in front of him, knowing the allegation would soon be public, and knowing that such an allegation could dramatically impact Lundry's future career in law enforcement.

86.

The May 22 letter also indicated that a basis for Lundry's pretextual termination was something the City's own investigation had already revealed he had no part in. Prior to the May 22 letter, the City had investigated whether Lundry had "pressed" employees to sign a letter of support for his candidacy for Chief. The investigation revealed that Lundry had no part in the generation or circulation of the letter in question; instead, another SPD employee had done so solely on their own accord. In other words, the City's termination of Lundry was so pretextual that the City justified terminating Lundry based on the actions of a different employee.

**J. The City's Termination Letter Acknowledges Unlawful Motivations.**

87.

In addition to being obviously pretextual, the City's May 22 letter revealed that Lundry was being terminated for unlawful reasons. In particular, in its May 22 letter, the City specifically acknowledged that it was terminating Lundry for engaging in constitutionally protected speech criticizing City leadership and for exercising his constitutional right to defend himself from the City's baseless allegations.

88.

As the City's own letter states, Deems decided to terminate Lundry based in part on Lundry having made a Facebook post as a private citizen stating that he would never accept the role of Chief "with the current mayor, council, and appointed leadership"—in other words, clearly criticizing City leadership, including Deems.

89.

The City's letter also expressly acknowledged that it was terminating Lundry's employment based on his effort to interview witnesses to defend himself from the City's baseless investigation. Lundry's rights include the right to interview witnesses and develop evidence in his defense—and retaliating against him for doing so is yet another violation of the constitutional rights. The City's letter omits the fact that none of the witnesses contacted by Lundry's attorneys has claimed that this outreach had any impact or influence on their statements to City investigators.

90.

In fact, as a public employee who could be fired only for cause, Lundry had a property right in his continued employment, meaning he could be terminated only upon the provision of constitutionally adequate due process. He did not receive the process to which he was entitled.

91.

The City also failed to offer Lundry the opportunity for the name-clearing hearing to which he was entitled under the constitution. Having publicly maligned and stigmatized Lundry—including by pursuing gratuitous opportunities to defame Lundry by inserting itself into social media debates—the City was required to provide him the opportunity to publicly clear his name. The City failed to do so.

92.

The City's May 22 letter also highlighted the unlawfulness of the City's treatment of Lundry. Specifically, in that letter, the City cited various alleged violations of the Sandy Police Department Policy Manual as the basis for terminating Lundry's employment.

//

//


**BRADLEY BERNSTEIN SANDS LLP**
1425 SW 20th Ave., Suite 201
Portland, OR 97201

93.

However, the SPD manual specifically limits the imposition of discipline to cases in which there is "good cause"—meaning that, under federal constitutional law, Lundry had a property interest in his continued employment such that the City could not discipline or terminate him without due process.

94.

In reality, the Defendants had no basis for removing Lundry as Interim Chief, for placing him on administrative leave, for investigating him in any way, or for referring him for criminal prosecution. The Defendants' asserted grounds for each of these actions was purely pretextual. In fact, having decided that Lundry should not be selected for the permanent role of Chief, the Defendants set out to find some mechanism for preventing him from moving forward.

95.

The Defendants' campaign against Lundry has unfortunately succeeded – by wrongly investigating him and ultimately terminating his employment, the Defendants have prevented him from obtaining the role of Chief that he had earned. Not only that, by repeatedly and falsely dragging him through the mud, they have prevented him from obtaining *any* employment as a law enforcement officer.

96.

In addition, the Defendants' false narrative regarding Lundry—a 20-year law enforcement officer with an unblemished record of service—has now taken hold in the Sandy community and beyond. The Defendants' false, disparaging comments regarding Lundry have been reposted and circulated widely, unjustly and irreparably damaging Lundry's reputation.


**BRADLEY BERNSTEIN SANDS LLP**
1425 SW 20th Ave., Suite 201
Portland, OR 97201

**FIRST CLAIM FOR RELIEF**

**Due Process – 42 U.S.C. § 1983**

*Against All Defendants*

97.

Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 96 as if fully set forth herein.

98.

In the course of investigating and terminating Lundry from his longtime employment with the City, Defendants smeared Lundry through a campaign of public, highly stigmatizing commentary falsely asserting that Lundry had engaged in criminal and/or workplace misconduct.

99.

Defendants failed to provide Lundry with the requisite name-clearing hearing to which he was constitutionally entitled. Instead, Defendants summarily disciplined and terminated Lundry without any such opportunity to clear his name.

100.

The City is liable for these violations of 42 U.S.C. § 1983 because Deems, an official with final policymaking authority, personally and deliberately made and/or ratified the decisions and actions described above. As City Manager, Deems is an official with final policymaking authority pursuant to Sandy City Code Chapter 2, which provides that he has general authority over all City employees and departments, including general authority to administer the City's personnel policies and decisions.

101.

Defendants' conduct caused substantial injury to Lundry in the form of lost income and lost retirement benefits in an amount to be proved at trial but presently


**BRADLEY BERNSTEIN SANDS LLP**
1425 SW 20th Ave., Suite 201
Portland, OR 97201

estimated at no less than $1.2 million as well as compensatory damages for emotional distress in an amount to be proved at trial.

102.

In addition, Lundry is entitled to recover punitive damages because Defendants acted maliciously, wantonly, oppressively and/or with reckless disregard to Lundry's rights.

103.

Lundry is entitled to his reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

**SECOND CLAIM FOR RELIEF**

**Due Process – 42 U.S.C. § 1983**

*Against All Defendants*

104.

Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 103 as if fully set forth herein.

105.

As an employee of SPD, Lundry could not be disciplined or terminated without "good cause" pursuant to the terms of the Sandy Police Department policy manual. The terms of that manual therefore created a property interest in Lundry's favor in his continued employment with SPD and the City.

106.

In disciplining and terminating Lundry, Defendants relied on and expressly invoked the SPD policy manual. However, Defendants failed to provide Lundry with the due process to which he was entitled under the SPD manual and federal constitutional law, and failed to allege or prove any "good cause" for his discipline or termination. In fact, no good cause existed.


BRADLEY BERNSTEIN SANDS LLP
1425 SW 20th Ave., Suite 201
Portland, OR 97201

107.

The City is liable for these violations of 42 U.S.C. § 1983 because Deems, an official with final policymaking authority, personally and deliberately made and/or ratified the decisions and actions described above. As City Manager, Deems is an official with final policymaking authority pursuant to Sandy City Code Chapter 2, which provides that he has general authority over all City employees and departments, including general authority to administer the City's personnel policies and decisions.

108.

Defendants' conduct caused substantial injury to Lundry in the form of lost income and lost retirement benefits in an amount to be proved at trial but presently estimated at no less than $1.2 million as well as compensatory damages for emotional distress in an amount to be proved at trial.

109.

In addition, Lundry is entitled to recover punitive damages because Defendants acted maliciously, wantonly, oppressively and/or with reckless disregard to Lundry's rights.

110.

Lundry is entitled to his reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

**THIRD CLAIM FOR RELIEF**

**First Amendment Retaliation – 42 U.S.C. § 1983**

*Against All Defendants*

111.

Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 110 as if fully set forth herein.

112.

The Defendants took adverse employment actions against Lundry by stripping him of his hard-earned role of Interim Chief of SPD, by placing him on administrative leave to conduct a baseless internal investigation, and ultimately by terminating him from his longtime employment with SPD.

113.

The Defendants took these adverse actions because Lundry engaged in conduct that is protected under the First Amendment: namely, (1) organizing private citizens' questioning and criticism of City leadership's decisionmaking processes relating to the police chief search; and (2) directly criticizing City leadership himself on social media.

114.

Specifically, Defendants took these adverse actions against Lundry for, in his role as a private citizen, organizing private citizens' critiques of City leaders' conduct and lack of transparency in January and February 2024, including during meetings with Pulliam, Deems, and City Council members and in the City Council's February 5 meeting.

115.

In addition, Defendants took these adverse actions against Lundry for making a Facebook post in his role as a private citizen stating that he would never accept the role of Chief "with the current mayor, council, and appointed leadership." The City explicitly stated that Lundry's Facebook post was part of its motivation for its adverse employment actions in its May 22 letter.

116.

Lundry's protected speech related to a matter of significant public interest—namely, the City's decisionmaking process surrounding the hiring of a new police


**BRADLEY BERNSTEIN SANDS LLP**
1425 SW 20th Ave., Suite 201
Portland, OR 97201

chief, including whether the City intended to hire someone with a demonstrated history of poor judgment and racist and sexist comments that would render him an ineffective police chief, at best, or endanger SPD officers and the community, at worst.

117.

Lundry's protected First Amendment activity was a substantial or motivating factor in the adverse employment actions Defendants took against him.

118.

Defendants' conduct constitutes the unlawful and unconstitutional denial of Lundry's First Amendment rights to free speech, petitioning, and/or political participation in violation of 42 U.S.C. § 1983.

119.

The City is liable for these violations of 42 U.S.C. § 1983 because Deems, an official with final policymaking authority, personally and deliberately made and/or ratified the decisions and actions described above. As City Manager, Deems is an official with final policymaking authority pursuant to Sandy City Code Chapter 2, which provides that he has general authority over all City employees and departments, including general authority to administer the City's personnel policies and decisions.

120.

Defendants' conduct caused substantial injury in the form of lost income and lost retirement benefits in an amount to be proved at trial but presently estimated at no less than $1.2 million as well as compensatory damages for emotional distress in an amount to be proved at trial.

//


**BRADLEY BERNSTEIN SANDS LLP**
1425 SW 20th Ave., Suite 201
Portland, OR 97201

121.

In addition, Lundry is entitled to recover punitive damages because Defendants acted maliciously, wantonly, oppressively and/or with reckless disregard to Lundry's rights.

122.

Lundry is entitled to his reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

## FOURTH CLAIM FOR RELIEF

### Whistleblower Retaliation – ORS 659A.203

***Defendants Deems and City***

123.

Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 123 as if fully set forth herein.

124.

By questioning Deems and the City's misuse of SPD funds to pay for the police chief recruitment process, Lundry engaged in protected whistleblowing conduct by disclosing information he reasonably believed was evidence of mismanagement, gross waste of funds and/or abuse of authority under ORS 659A.203(1)(b)(B).

125.

In addition, or in the alternative, Lundry engaged in protected whistleblowing conduct by discussing the activities of the City and its senior officials—namely, Deems, Aprati and Pulliam—with the City Council President, a member of the elected governing body of the City.

//

//


BRADLEY BERNSTEIN SANDS LLP
1425 SW 20th Ave., Suite 201
Portland, OR 97201

126.

Deems and the City took adverse employment action against Lundry by stripping him of his hard-earned role of Interim Chief of SPD, by placing him on administrative leave to conduct a baseless internal investigation, and ultimately by terminating him from his longtime employment with SPD.

127.

Pursuant to ORS 659A.885(1) and (2), Lundry is entitled to bring an action for violations of ORS 659A.203.

128.

Pursuant to ORS 659A.885(1) and (3), Lundry is entitled to recover compensatory damages for back pay, lost income and lost retirement benefits in an amount to be proved at trial but presently estimated at no less than $1.2 million and compensatory damages for emotional distress in an amount to be proved at trial.

129.

Pursuant to ORS 659A.885(3), Lundry is entitled to recover punitive damages because Deems' and the City's violations of ORS 659A.203(1)(b) were willful, wanton, and malicious.

130.

Lundry is entitled to his reasonable attorneys' fees and costs pursuant to ORS 659A.885(1).

**FIFTH CLAIM FOR RELIEF**

**Wrongful Discharge**

***Defendants Deems and City of Sandy***

131.

Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 131 as if fully set forth herein.


BRADLEY BERNSTEIN SANDS LLP
1425 SW 20th Ave., Suite 201
Portland, OR 97201

132.

Deems and the City discharged Lundry from employment with the City.

133.

Deems and the City's discharge of Lundry was wrongful in that he was discharged in violation of public policy and/or for exercising an important job-related right. Specifically, Lundry was discharged in part for organizing public records requests directed at the City intended to shed light on the City's decisionmaking processes on an issue of significant public interest.

134.

Oregon has a longstanding public policy that recognizes the paramount importance of the public's right to inspect government records. The purpose of that right is to ensure the public can determine whether government officials are honestly and competently performing their function as public servants.

135.

There is no other adequate remedy for Deems' and the City's wrongful discharge of Lundry based on his participation in the submission of public records requests to the City.

136.

Lundry is entitled to recover compensatory damages for back pay, lost income and lost retirement benefits in an amount to be proved at trial but presently estimated at no less than $1.2 million as well as compensatory damages for emotional distress in an amount to be proved at trial.

137.

Lundry is entitled to recover punitive damages in an amount to be proved at trial because Deems' and the City's conduct was willful, wanton, and malicious.


**BRADLEY BERNSTEIN SANDS LLP**
1425 SW 20th Ave., Suite 201
Portland, OR 97201

138.

Lundry is entitled to recover reasonable attorneys' fees and litigation costs pursuant to ORS 659A.885.

**WHEREFORE,** Plaintiff prays for judgment against Defendant as follows:

1. On his First Claim for Relief, economic damages in an amount to be proved at trial but presently estimated at no less than $1.2 million, noneconomic damages for pain, suffering, emotional distress and reputational harm in an amount to be proved at trial, punitive damages in an amount to be proved at trial, and for reasonable attorneys' fees and litigation costs.

2. On his Second Claim for Relief, economic damages in an amount to be proved at trial but presently estimated at no less than $1.2 million, noneconomic damages for pain, suffering, emotional distress and reputational harm in an amount to be proved at trial, punitive damages in an amount to be proved at trial, and for reasonable attorneys' fees and litigation costs.

3. On his Third Claim for Relief, economic damages in an amount to be proved at trial but presently estimated at no less than $1.2 million, noneconomic damages for pain, suffering, emotional distress and reputational harm in an amount to be proved at trial, punitive damages in an amount to be proved at trial, and for reasonable attorneys' fees and litigation costs.

4. On his Fourth Claim for Relief, economic damages in an amount to be proved at trial but presently estimated at no less than $1.2 million, noneconomic damages for pain, suffering, emotional distress and reputational harm in an amount to be proved at trial, punitive damages in an amount to be proved at trial, and for reasonable attorneys' fees and litigation costs.

5. On his Fifth Claim for Relief, economic damages in an amount to be proved at trial but presently estimated at no less than $1.2 million, noneconomic

damages for pain, suffering, emotional distress and reputational harm in an amount to be proved at trial, punitive damages in an amount to be proved at trial, and for reasonable attorneys' fees and litigation costs.

6. Such other relief as the Court deems just and proper.

DATED: August 28, 2024

s/Colin Hunter
Colin Hunter, OSB No. 131161
chunter@bradleybernstein.com
Bradley Bernstein Sands LLP
1425 SW 20th Ave., Suite 201
Portland, Oregon 97201
Telephone: 971.337.0190

Christopher Heywood, OSB No. 163984
chris@jhoffman.com
Janet Hoffman & Associates LLC
1000 S.W. Broadway, Suite 1500
Portland, Oregon 97205
Telephone: 503.222.1125

*Attorneys for Plaintiff*